IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KROHMER MARINA, LLC, et al.,

Plaintiffs,

v.                                                        Case No. 20-CV-402-JWB

CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON, et al.,

Defendants.

## MEMORANDUM AND ORDER

Presently before the court are two motions.  The Society of Lloyd's ("Lloyd's") specially appears in place of the defendant named as "Certain Underwriters at Lloyd's, London" ("Underwriters") and moves to dismiss the Underwriters under Rule 12.  (Doc. 35.)  And Defendant International Insurance Co. of Hannover SE ("Hannover") moves to stay the proceedings pending the completion of arbitration.[1]  (Doc. 48.)  Plaintiffs have filed their responses in opposition.  (Docs. 38 & 49.)  Defendants have filed their replies.  (Docs. 41 & 52.)  For the reasons stated herein, Lloyd's motion to dismiss is GRANTED and Hannover's motion to stay is DENIED.

## I.      BACKGROUND

This diversity action arises out of an insurance claim for flood and wind damage/loss of business income.  Plaintiffs Dustin and Suzanne Krohmer are the owners of Krohmer Marina, LLC, d/b/a Evergreen Marina.  Evergreen Marina is located on Lake Eufaula, Oklahoma and it

---

[1] Hannover also moves for a hearing on the pending dispositive motions.  (Doc. 57.)  The court has reviewed the briefs, the record, and the applicable law, and concludes that it can rule on the motions without the benefit of a hearing.  Accordingly, the motion for hearing is denied.

offers boat rentals and sales, RV rentals, and merchandise sales.  Plaintiffs also own and operate a restaurant, Dam Bar & Grill, and a full-service ship store on the property.  (Doc. 32 at 1–2.)

Plaintiffs entered into an insurance agreement (the "Policy") to secure commercial marine liability coverage and coverage for damage to the Evergreen Marina and business interruption. (Doc. 32-1.)  The Policy provides coverage for loss and/or damages caused by flood and wind, among other things.  (*Id*. at 3.)  The Policy was in effect from April 4, 2019, until April 4, 2020. (*Id.* at 2.)

Plaintiffs allege that Hannover, a German insurance company, "subscribed to the subject Policy for a 100% share of the risk."  (Doc. 32 at 7.)  However, Plaintiffs also allege that Hannover placed the Policy in the Lloyd's of London insurance market "using certain registered Lloyd's brokers to underwrite the subject Policy."  (*Id*.)  According to Plaintiffs, "Lloyd's is comprised of multiple syndicates who price and underwrite the risk of insurance policies issued at Lloyd's Marketplace via more than two hundred (200) registered Lloyd's insurance brokers."  (*Id.* at 5.) Plaintiffs allege that a group of Lloyd's brokers, who have identified themselves only as "Certain Underwriters at Lloyd's, London," issued and/or underwrote the subject Policy.[2]  (*Id*. at 5.)

On or about May 10, 2019, the water levels at Lake Eufaula had risen significantly, flooding the Evergreen Marina and causing damage to the boat houses and other property. Plaintiffs submitted their initial claim (number 4162684) for property damages.  (*Id.* at 3.) Plaintiffs allege that Defendants confirmed that the May 10 property damages were due to the flood event, and Plaintiffs' loss was covered under the Policy.  (*Id*.)

---

[2] Plaintiffs allege that pre-litigation discovery "has revealed Alsford Page & Gems, Limited (APG) as one of the registered Lloyd's brokers who issued and/or underwrote the subject Policy."  (Doc. 32 at 6.)  And Plaintiffs allege that "[o]ther Lloyd's brokers involved in issuing and/or underwriting the subject Policy (if any) are yet to be identified in discovery."  (*Id.* at 6–7.)  APG is not a party to this action.

On or about June 5, 2019, the area near Lake Eufaula experienced high winds causing additional damages to the boat houses and other property.  (*Id*.)  Plaintiffs allege that they timely and properly submitted their claim (number 4163007) for the June 5 windstorm event, and that the windstorm event is a covered peril pursuant to the Policy.  (*Id*. at 4.)  However, Plaintiffs allege that Defendants have failed to fully adjust the repair costs for the physical damage resulting from the windstorm event.  (*Id*.)  Plaintiffs further allege that the severe damage resulted in significant interruption and/or suspension of normal business operations, and that the loss of business income exceeds $755,000.00.  (*Id*.)  Plaintiffs allege that they timely submitted a claim, but that Defendants failed to timely and fully adjust the business interruption claim.  (*Id*.)  Overall, Plaintiffs claim approximately $2,000,000.00 in damages.  (*Id*. at 5.)

Plaintiffs filed this action on November 9, 2020.  (Doc. 1.)  Plaintiffs filed an amended complaint on March 19, 2021.  (Doc. 16.)  And Plaintiffs filed their second amended complaint on October 26, 2021.  (Doc. 32.)  Plaintiffs bring breach of contract and bad faith claims against Hannover and the Underwriters.  In Count 1, Plaintiffs allege that, "[b]y failing to fully and timely indemnify Plaintiffs for their losses covered by the Policy, Defendants have breached their contractual obligations under the terms and conditions of the Policy." (*Id*. at 10–11.)  Plaintiffs allege "unreasonable delays" and that their claims were "improperly adjusted" thereby breaching Defendants' obligations to promptly and fully investigate claims and pay the full amount of benefits owed under the Policy.  (*Id*. at 11.)  In Count 2, Plaintiffs allege that Defendants have caused unreasonable delays in processing Plaintiffs' claims number 4162684 and 4163007 by taking over a year and a half following the covered flood and windstorm events to process Plaintiffs' claims and failing to issue more than relatively insignificant advance payments on each claim after Plaintiffs initiated legal action against Defendants, and then the post-litigation

payments were improperly adjusted to the benefit of the insurers and the detriment of Plaintiffs. As such, Plaintiffs allege that Defendants have breached their obligations under the insurance agreement to promptly and fully investigate claims and pay the full amount of benefits owed under the Policy.  (*Id*. at 12.)  Plaintiffs allege that Defendants' acts and omissions were unreasonable and constitute bad faith.  (*Id*. at 13.)

On November 15, 2021, Lloyd's specially appeared in place of the Underwriters and filed a motion to dismiss.  (Doc. 35.)  On December 30, 2021, Hannover filed a motion to stay pending arbitration.  (Doc. 48.)  And on August 15, 2022, Hannover filed a motion for hearing on the pending motions.  (Doc. 57.)

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

Upon a motion to dismiss, the court must determine whether a complaint states a legally cognizable claim by making allegations that, if true, would show that the plaintiff is entitled to relief.  The pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678 (citing *Twombly*, 550 U.S. at 556).

### B.  Motion to Stay

Hannover moves to stay this action and asks the court to order arbitration pursuant to the Federal Arbitration Act ("FAA").  Specifically, Hannover moves under Chapter 1 of the FAA, 9 U.S.C. §§ 1–16.  (Doc. 48 at 8.)  Chapter 1, Section 2 provides that:

> A written provision in . . . a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy thereafter

> arising out of such contract . . . shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in equity for
> the revocation of any contract.

9 U.S.C. § 2.

Chapter 1, Section 3 further provides that a stay is required if the case involves "any issue referable to arbitration under an agreement in writing":

> If any suit or proceeding be brought in any of the courts of the
> United States upon any issue referable to arbitration under an
> agreement in writing for such arbitration, the court in which such
> suit is pending, upon being satisfied that the issue involved in such
> suit or proceeding is referable to arbitration under such an
> agreement, shall on application of one of the parties stay the trial of
> the action until such arbitration has been had in accordance with the
> terms of the agreement, providing the applicant for the stay is not in
> default in proceeding with such arbitration.

*Id*. § 3.

"[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). The Supreme Court has recognized a presumption in favor of arbitrability, which requires courts to rule a dispute arbitrable "where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and . . . the presumption is not rebutted." *See id*. at 300–301.

## III.   ANALYSIS

### A.   Lloyd's Motion to Dismiss

First, Lloyd's contends that Plaintiffs fail to state a claim against the Underwriters because the Policy conclusively demonstrates that Hannover exclusively insured and underwrote the entire Policy, and thus it is not possible that any other insurers underwrote or insured the Policy. And because no other underwriters associated with Lloyd's (besides Hannover) were a party to the

contract, they cannot be held liable for breach of contract or bad faith.  But Plaintiffs contend that the second amended complaint contains "sufficient facts to show that Lloyd's had entered into an insurance agreement with Plaintiffs" and that the Policy was "issued and underwritten by Lloyd's." (Doc. 38 at 4.)

Ordinarily, a "motion to dismiss challenging the legal sufficiency of the complaint is properly considered under Rule 12(b)(6) if the court analyzes only the complaint itself." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).  "A district court may, however, consider documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id*.  And "factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *Peterson v. Martinez*, 707 F.3d 1197, 1206 (10th Cir. 2013).

Here, Plaintiffs allege in the second amended complaint that "Certain Underwriters at Lloyd's, London is a group of one or more registered Lloyd's brokers who issued and/or underwrote the subject Policy."  (Doc. 32 at 5.)  If the court accepts this allegation as a well-pleaded fact, then the Lloyd's Underwriters are properly named as defendants to Plaintiffs' breach of contract and bad faith claims.  However, the court will not accept this allegation if it is contradicted by the language of the attached Policy.[3]

The issue here is fundamentally an issue of contract interpretation to determine whether any Underwriters were a party to the contract.  This is because under Oklahoma law, an insured cannot state a claim for breach of contract against an entity with whom the insured is not in privity of contract.  *See Drummond v. Johnson*, 643 P.2d 634, 639 (Okla. 1982) ("[C]ontracts are binding only upon those who are parties thereto, and are enforceable only by the parties to a contract, or

---

[3] The court considers the Policy here because it is: (1) attached to the second amended complaint, (2) central to Plaintiffs' claims, and (3) undisputed as to its accuracy and authenticity.  *See Brokers' Choice*, 861 F.3d at 1103.

those in privity with it . . . ."); *see also Wathor v. Mut. Assur. Adm'rs Inc.*, 87 P.3d 559, 562 (Okla. 2004) ("[A]gents are not parties to the insurance contract.").   Nor can an insured state a claim against an entity for bad faith when that entity is not a party to the insurance contract.   *See Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907, 912–13 (Okla. 1982) ("[I]t is clear that the [breach of the duty of fair dealing and good faith] will not lie against a stranger to the contract."); *Utd. Adjustment Servs., Inc. v. Pro. Ins. Agency, LLC*, 307 P.3d 400, 405 (Okla. Civ. App. 2013) ("Oklahoma law clearly provides that an insured cannot bring a bad faith claim against an insurance agency or its agent because they are not parties to the insurance contract.").

Having reviewed the Policy, the court finds that no Lloyd's Underwriters issued or underwrote the Policy.   The Policy provides commercial marine liability coverage (section one) and coverage for the Evergreen Marina against physical damage and business interruption (section two).   (*See* Doc. 32-1 at 13.)   In outlining coverage and exclusions, the Policy refers to the insurer as the "Company" and "we," and refers to the insured as the "Insured" and "you."   (*See, e.g.*, *id.* at 14 ("The Company will pay those sums that the Insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this Insurance applies."); *id.* at 44 ("We will pay for 'loss' to Covered Property from any of the Covered Causes of Loss.")).

The "Insured" is defined as "the person or legal entity shown on the Declarations Page," i.e., Plaintiffs.   (*Id.* at 40).   The "Company" is not given a specific definition, but it is clear that the "Company" is Hannover, and no one else.   Indeed, the introductory letter discusses a single "insurer," who is identified as "Inter Hannover."   (*See* Doc. 32-1 at 1–2.)   Then, the first instance of the term "Company" in the operative Policy language is found on page five, in a section captioned "Company Participation by Premium."   This section is indicative of a Lloyd's market policy, as it allows for the inclusion of multiple underwriters, or "names," to "subscribe to provide

7

insurance coverage on percentages of policy risk." *Nat'l Union Fire Ins. Co. of Pitt., PA v. Siemens Energy, Inc.*, 2013 WL 3323182, at *2 (S.D. Tex. 2013).   But here, the Policy clearly states that just one "company" is subscribing to provide insurance coverage.   It provides:

THE FOLLOWING COMPANY IS PARTICIPATING IN THE LISTED POLICY
NUMBER.  THE PERCENT PARTICIPATION IS BASED ON THE PREMIUM.

| Company Name | % Participation |
|---|---|
| International    Insurance Co of Hannover SE | 100% |

(Doc. 32-1 at 5.)

The court finds nothing in the Policy to suggest that the "Company" includes any other underwriters besides Hannover, or that any other underwriters agreed to provide insurance coverage on a percentage of policy risk here.   Nevertheless, Plaintiffs argue that this "does not exclude the possibility that Lloyd's [Underwriters] issued and underwrote the Policy."   (Doc. 38 at 5.)   Plaintiffs cite to the Policy's "Several Liability Notice" which provides that the *insurers* are severally liable consistent with their obligations under the Policy.   (*See* Doc. 32-1 at 81 ("The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions.   The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.")).   Plaintiffs also contend documents obtained during pre-litigation discovery (i.e., new loss assignment, third-party adjuster's report, and emails), demonstrate that Lloyd's was an active participant in adjusting and handling their claims.   (*See* Doc. 32 at 6–7; Doc. 38 at 7.)

The court disagrees.   In theory, it would not be unusual for hundreds of Lloyd's underwriters or "Names" to subscribe to a single policy, while only disclosing the "lead"

8

underwriter on the policy as representative of all the Names on the policy, with all other Names remaining anonymous. *Corfield v. Dallas Glen Hills LP*, 355 F.3d 853, 858–59 (5th Cir. 2003); *see also Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1083–84 (11th Cir. 2010). In these policies, Lloyd's standard policy is to include a provision stating: "that in any suit instituted against any one of [the Names] upon this contract, [all the Names] will abide by the final decision of such Court or of any Appellate Court in the event of an appeal." *Corfield*, 355 F.3d at 859; *see also Osting-Schwinn*, 613 F.3d at 1084 ("As is typical, the Rockhills' contract has a provision explaining that 'in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.'"). This provision creates a contractual relationship "as if each Name had a contract with the insured." *Osting-Schwinn*, 613 F.3d at 1084; *see also Corfield*, 355 F.3d at 859 (stating that the Lloyd's standard policy language contractually binds each Name "on an individual basis to the insured to adhere to any adverse judgment reached in the suit notwithstanding that only one Name participates in the litigation as a named party").

But here, it is clear that the only contractual relationship created by the Policy is between Plaintiffs and Hannover. The Policy does not contain any provisions resembling the Lloyd's standard policy language as discussed in *Corfield* and *Osting-Schwinn*. There is no language indicating that Hannover will serve as the "lead" underwriter for any other underwriters. And there is no language indicating that any other underwriters would have any involvement in the Policy.

To be sure, it was poor judgment to include a Notice of Several Liability, and to use the term "Underwriters" numerous times throughout the Policy. But these do not evidence the intent to create a contractual relationship with any unnamed Lloyd's Underwriters as Plaintiffs contend.

First, the Notice appears to be standard form language that is required for Lloyd's market policies. *See* Lloyd's Act, 1982, c.14, § 8(1) (providing that an "underwriting member shall be a party to a contract of insurance underwritten at Lloyd's only if it is underwritten with several liability, each underwriting member for his own part and not one for another, and if the liability of each underwriting member is accepted solely for his own account."). It describes in general terms how several liability works when subscribing insurers have obligations "under contracts of insurance." (*See* Doc. 32-1 at 81 ("The subscribing insurers' obligations *under contracts of insurance* to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions." (emphasis added.))) It does not state that there are multiple insurers subscribing to *this* insurance contract. And because there are no co-subscribing insurers, it is not applicable here.

Second, the use of the term "Underwriters" could imply that additional, anonymous Names have subscribed to the Policy, with Hannover serving as the lead underwriter.[4] (*See, e.g.*, Doc. 32-1 at 62 ("Underwriters have no liability under this Policy, and cover is excluded, for: Any accident arising out of any Operations which are not lawful . . . .")). However, a "fundamental tenet of contract interpretation is that provisions cannot be read in isolation." *Sanpete Water Cons. Dist. v. Carbon Water Cons. Dist.*, 226 F.3d 1170, 1179 (10th Cir. 2000). And here, the term "underwriters" is defined in the Policy to mean "[t]he underwriters subscribing to this Policy." (Doc. 32-1 at 73.) As stated above, Hannover is the only company who subscribed to the Policy, as a 100% participant. (*Id*. at 5.) Thus, the use of the plural noun "Underwriters" does not evidence the parties' intent to create a contractual obligation with any anonymous Underwriters.[5]

---

[4] It is also worth noting that Hannover denies being an underwriting member of Lloyd's. (Doc. 36-1 at 2 (stating that "Hannover is not an underwriting member of Lloyd's and so does not trade under the names 'certain underwriters at Lloyd's, London' or 'underwriters at Lloyd's, London.'"))

[5] Because the court finds that the contract is unambiguous, the court did not consider Plaintiffs' extrinsic evidence (i.e., documents and emails created after the Policy was in effect) in interpreting the Policy. *See Nat'l Bank & Trust Co. of Vinita v. Kissee*, 859 P.2d 502, 506–507 (Okla. 1993) ("In the absence of accident, fraud, or mistake of fact,

Accordingly, the court finds that the Policy unambiguously denotes Hannover as the only insurer who contracted with Plaintiffs to provide insurance coverage under the Policy. *See* 3 Couch on Insurance § 39.1 (3d ed. Nov. 2022) ("An insurer is the party to a contract of insurance who assumes the risk and undertakes to indemnify the insured or pay a certain sum on the happening of a specified contingency."). The Policy thus contradicts Plaintiffs' allegations in the second amended complaint that "Certain Underwriters at Lloyd's" issued and/or underwrote the subject Policy. Because there are no well-pleaded facts establishing that any Lloyd's Underwriters were a party to the contract, Plaintiffs have failed to state a claim against the Underwriters for breach of contract or bad faith.

Accordingly, the court dismisses these claims for failure to state a claim. *See Wise v. CSAA Gen. Ins. Co.*, 2016 WL 1732746, at *2 (N.D. Okla. 2016) (dismissing breach of contract and bad faith claims against insurance agency because the agency was not a party to the insurance contract at issue and the plaintiff therefore failed to state a claim); *Snow & Ice, Inc. v. MPR Mgmt., Inc.*, 2017 WL 438969, at *3 (Ill. Ct. App. 2017) (dismissing breach of contract claim against property owner defendants when the contract stated it was made between the plaintiff and a realty company; although the contract repeatedly referred to "property owner," the contract did not further define that term and it identified no other entities as a party to the contract). To the extent Plaintiffs are able to successfully prove their claims for breach of contract and bad faith, Hannover will be solely liable for the entirety of the damages.

### B.  Hannover's Motion to Stay Pending Arbitration

---

when the language of a written contract is complete, unambiguous and free from uncertainty as to the parties' intentions, parole evidence of prior representations, contemporaneous agreements or understandings tending to change, contradict, or enlarge the plain terms of the written contract are inadmissible.").

Next, Hannover moves to stay this litigation pending completion of mandatory, binding arbitration.  (Doc. 48.)  The Arbitration clause in the Policy states:

> Any dispute arising under, out of or in connection with this Policy, including formation and validity, and whether arising before, during or after the Policy Period, shall be referred to arbitration in London. The arbitration tribunal will be appointed as follows:
>
>> The claimant (the party requesting arbitration) will commence arbitration by appointing an arbitrator and giving the respondent written notice of the appointment; The respondent must appoint an arbitrator or agree a sole arbitrator, and give notice to the claimant, within 14 days of receiving notice of the claimant's appointment; If the parties each appoint an arbitrator, the arbitrators will appoint a third arbitrator who will act as chairman;
>>
>> If the respondent fails to appoint an arbitrator in accordance with the above, it will be treated as having agreed to the appointment of the arbitrator appointed by the claimant as a sole arbitrator, and the arbitrator will proceed accordingly.
>
> Unless the parties otherwise agree, the arbitrators will have not less than 10 years' experience of insurance or reinsurance as persons engaged in the industry itself or as lawyers or other professional advisors, but may be retired.
>
> The arbitration tribunal has power to fix all procedural rules for the holding of the arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, disclosure, inspection of the documents, examination of witnesses and any other matter whatsoever relating to the conduct of the arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it may think fit. All costs of the arbitration shall be determined by the arbitration tribunal who may direct to whom and in what manner they shall be paid. The arbitration tribunal will give its award in writing. The award of the arbitration tribunal is binding on the parties.

(Doc. 32-1 at 69.)

On December 27, 2021, Hannover's counsel commenced arbitration by providing written notice to Plaintiffs' counsel of the appointment of Charles D. "Buddy" Neal, Jr. as the arbitrator.

Hannover contends that Mr. Neal has considerably more than 10 years' experience of insurance or reinsurance as a person engaged in the industry itself or as a lawyer or other professional advisor. To date, Plaintiffs' counsel has not appointed an arbitrator or agreed that Mr. Neal can be the sole arbitrator.

Hannover moves to stay this action pending completion of arbitration because the parties have agreed to mandatory, binding arbitration of all claims arising out of the Policy.  In its motion, Hannover contends that arbitration is mandatory and binding because the Policy is subject to Chapter 1 of the FAA.  *See* 9 U.S.C. § 2 (providing that arbitration agreements in any "maritime transaction" or "contract evidencing a transaction involving commerce" are valid and enforceable).

In their response, Plaintiffs argue that the Policy is neither a maritime transaction, nor does it implicate interstate commerce.  Plaintiffs further argue that even if the Policy does implicate Chapter 1 of the FAA, the McCarran-Ferguson Act authorizes state insurance laws to "reverse-preempt" the FAA.  *See* 15 U.S.C. § 1012(b) ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . .").  Plaintiffs thus contend that the Oklahoma Uniform Arbitration Act ("OUAA") governs the Policy, not Chapter 1 of the FAA.  And because the OUAA prohibits arbitration agreements in insurance contracts, Plaintiffs contend that the Policy's arbitration clause is invalid and unenforceable.  *See* Okla. Stat. tit. 12, § 1855(D) (stating that the OUAA "shall not apply to . . . contracts which reference insurance, except for those contracts between insurance companies").

In its reply, Hannover contends that McCarran-Ferguson does not apply in this case because Hannover is a citizen of Germany.  Although not explicitly stated, Hannover is essentially arguing for the first time that this case involves an international arbitration agreement, which is subject to Chapter 2 of the FAA.  *See* 9 U.S.C. §§ 201–208.  Hannover cites a Fourth Circuit case

holding that McCarran-Ferguson is limited to domestic affairs, so it does not authorize state laws to reverse-preempt Chapter 2 of the FAA.

> ### 1.        Chapter 1 of the FAA

The first issue is whether the Policy's arbitration clause is enforceable under Chapter 1 of the FAA.  Chapter 1, Section 2 provides:

> A written provision in any *maritime transaction* or a *contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

9 U.S.C. § 2 (emphasis added); *see also id.* § 3 (stating that a court, "upon being satisfied that the issue involved . . . is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .").

> #### a.        The Policy is subject to Chapter 1 of the FAA because it involves interstate commerce.

Hannover contends that the Policy involves a "maritime transaction," and/or it is a "contract evidencing a transaction involving commerce," and is therefore enforceable under Chapter 1 of the FAA.  The court need not address whether the Policy involves a "maritime transaction" because it finds the Policy has a sufficient nexus to interstate commerce.  The language "involving commerce" in the FAA has been interpreted to mean "the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco,*

*Inc.*, 539 U.S. 52, 56 (2003) (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–74 (1995)).

Here, the insurance contract involves Plaintiffs (Oklahoma residents) and Hannover (German corporation). It was produced to Plaintiffs' agent through SW Risk Agency Services, a company in Dallas, Texas. (Doc. 32-1 at 2.) And the Policy provides instructions on reporting a loss to a Third Party Claims Administrator located in Florida. (*Id.* at 6.) Accordingly, the court finds that the Policy affects interstate commerce. *See, e.g.*, *United States v. Turner*, 301 F.3d 541, 544 (7th Cir. 2002) (finding the "business of insurance does affect interstate commerce"); *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 762 (S.D.N.Y. 2013) (citing cases and holding that insurance contract between a New York corporation and foreign corporation involved interstate commerce). As such, the Policy's arbitration clause is valid and enforceable under Chapter 1 of the FAA.

> **b.** **Under the McCarran-Ferguson Act, Oklahoma law reverse-preempts Chapter 1 of the FAA.**

This, however, does not end the court's inquiry. The next issue is whether the McCarran-Ferguson Act requires Chapter 1 of the FAA to yield to Oklahoma law, which prohibits arbitration agreements in insurance policies such as the Policy at issue here. *See* Okla. Stat. tit. 12, § 1855(D) (stating that the OUAA "shall not apply to . . . contracts which reference insurance, except for those contracts between insurance companies"); *see also Rollings v. Thermodyne Indus.*, 910 P.2d 1030, 1036 (Okla. 1996) (stating that under Oklahoma law, arbitration clauses are invalid unless expressly authorized by statute). In most instances, the Supremacy Clause of the United States Constitution mandates that a state law give way to a conflicting federal law. However, the McCarran-Ferguson Act provides that:

> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . .

15 U.S.C. § 1012(a)–(b).  In other words, state insurance laws reverse-preempt conflicting federal law by operation of McCarran-Ferguson.  *See U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993) (explaining that McCarran-Ferguson "transformed the legal landscape by overturning the normal rules of pre-emption").

Here, Plaintiffs contend that § 1855(D) of the OUAA reverse-preempts Chapter 1 of the FAA because it is a state law enacted for the purpose of regulating the "business of insurance." Although the OUAA is principally a law regulating arbitration, the Oklahoma Supreme Court has held that § 1855(D) was enacted for the purpose of regulating the "business of insurance."  *Sparks v. Old Republic Home Prot. Co*., 467 P.3d 680, 691 (Okla. 2020) ("We further hold that § 1855 of this Act is a state law enacted for the purpose of regulating insurance, and thus, the McCarran-Ferguson Act applies precluding the Federal Arbitration Act from preempting conflicting state law.").

The Tenth Circuit has not specifically addressed whether § 1855(D) is an insurance statute. But the court has analyzed a substantially similar[6] provision in the Kansas Uniform Arbitration Act ("KUAA"), which invalidated arbitration provisions in "contract[s] of insurance."  *See Mut. Reinsurance Bureau v. Great Plains Mut. Ins. Co., Inc*., 969 F.2d 931, 932 (10th Cir. 1992); K.S.A. 5-401 (1992) ("A written agreement to submit any existing controversy to arbitration or a provision

---

[6] The only distinction is that the Kansas statute prohibited arbitration agreements in all insurance contracts, while § 1855(D) permits arbitration agreements in insurance contracts between insurance companies.  The Policy at issue here is not between insurance companies, so the arbitration agreement is invalidated under § 1855(D).

in a written contract, other than a contract of insurance . . . to submit to arbitration any controversy, other than a claim in tort, thereafter arising between the parties is valid, enforceable and irrevocable."). The court determined that even though the provision was in the KUAA, not the insurance code, it "directly regulates the relationship between the insurance company and its policyholder by stating that an agreement between the two to arbitrate a dispute is unenforceable." *Mut. Reinsurance Bureau*, 969 F.2d at 933. Thus, the court held that the KUAA combined with the McCarran-Ferguson Act precluded the application of Chapter 1 of the FAA to the reinsurance agreement at issue in the case. *Id*. at 932–35.

In light of these decisions, the court concludes that § 1855(D) was enacted for the purpose of regulating the "business of insurance," so the McCarran-Ferguson Act applies. Accordingly, § 1855(D) reverse-preempts federal law and precludes the application of Chapter 1 of the FAA to the Policy's arbitration clause.

### 2.     Chapter 2 of the FAA

In its reply, Hannover argues that "the McCarran-Ferguson Act simply does not apply in this federal diversity action, admittedly between Plaintiffs and Defendant Hannover, a citizen of a foreign nation, namely Germany." (Doc. 52 at 4.) Hannover does not explicitly argue for the application of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), or its implementing legislation, Chapter 2 of the FAA (also referred to as the "Convention Act").[7] 9 U.S.C. §§ 201–208. But this can be inferred from Hannover's reliance on two cases from the Fourth and Fifth Circuits, which analyzed federal law on the

---

[7] Hannover raises the affirmative defense of mandatory, binding arbitration in its Answer to Plaintiffs' second amended complaint. (Doc. 34 at 11–12.) Hannover contends the district court's authority to order arbitration arises from 9 U.S.C. § 4, which is found in Chapter 1 of the FAA. (*Id*. at 12.) Hannover does not cite or reference Chapter 2 of the FAA/the Convention Act in its Answer. Additionally, Hannover specifically moves to stay pursuant to 9 U.S.C. § 3 (Chapter 1) and not 9 U.S.C. § 206 (Chapter 2). (Doc. 48 at 8.)

enforcement of *international* arbitration agreements.  *See Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 720 (5th Cir. 2009) (en banc) (holding that McCarran-Ferguson did not apply to international treaties, and thus did not cause state law to reverse-preempt the Convention); *ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 388–90 (4th Cir. 2012) (holding that the Convention Act does not fall within the scope of McCarran-Ferguson and is not subject to reverse-preemption).

Specifically, these cases addressed the clash between state statutes that prohibited arbitration agreements in insurance contracts, and Article II, Section 3 of the Convention, which generally requires United States courts to enforce written arbitration agreements between foreign and domestic entities.[8]  At the center of this conflict is McCarran-Ferguson, which provides that "[n]o *Act of Congress* shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b) (emphasis added).

### a.    Out-of-Circuit Authority

---

[8] The Convention is a multilateral treaty crafted during a 1958 United Nations conference.  Article II of the Convention provides, in relevant part:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

The Convention art. II, June 10, 1958, 21 U.S.T. 2517.  The Convention obligates signatories (1) to recognize and enforce written agreements to submit disputes to foreign arbitration and (2) to enforce arbitral awards issued in foreign nations.  *See id.* arts. I–III.  "The United States, although a participant in the drafting conference, did not immediately accede to the Convention."  *ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 382 (4th Cir. 2012).  "Rather, the Senate gave its advice and consent to accession in 1968, and President Nixon approved the accession in September 1970."  *Id.*  The Convention entered into force in the United States on December 29, 1970, after Congress enacted Chapter 2 of the FAA/the Convention Act.  *Id.*  The first section of Chapter 2 provides that: "[t]he Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter."  9 U.S.C. § 201.  Section 201 then clarifies that arbitration agreements and awards arising out of commercial relationships, unless they are entirely between United States citizens and have no "reasonable relation with one or more foreign states," fall under the Convention.  *Id.* § 202.  Sections 203–205 provide rules regarding jurisdiction and venue.  And section 206 permits federal district courts to "direct that arbitration be held" and "appoint arbitrators" in accordance with the parties' agreement.  *Id.* § 206.

In *Safety National*, the Fifth Circuit addressed the interaction between the Convention, the Convention Act, and the McCarran-Ferguson Act, in a case involving a Louisiana statute barring the use of arbitration clauses in insurance disputes.  *Safety Nat'l*, 587 F.3d at 717.  The en banc majority explained that it was unclear whether the Convention was non-self-executing (and therefore did not have legal effect in domestic courts absent implementing legislation).  However, even assuming the Convention was non-self-executing, the majority held that reverse-preemption did not apply.  The majority reasoned that McCarran-Ferguson applied only to statutes, not treaties. *See id*. at 718 ("Congress did not intend to include a treaty within the scope of an 'Act of Congress' when it used those words in the McCarran–Ferguson Act.").  The majority explained that, despite the presence of implementing legislation, the Convention, not the Convention Act, was being "construe[d]" to supersede state law, because the Convention Act implements the Convention largely by reference rather than setting out the Convention's provisions within the text of the Convention Act.  *Id*. at 718, 724–25.  And because McCarran-Ferguson did not apply to treaties, the majority held that it could "not cause [state law] to reverse-preempt the Convention."  *Id*. at 732.

Judge Elrod, joined by two other judges, provided a dissent.  She opined that the majority erroneously inquired whether the Convention itself was an Act of Congress.  *Safety Nat'l*, 587 F.3d at 737–38 (Elrod, J., dissenting).  The appropriate inquiry, according to Judge Elrod, was whether the legislation implementing the Convention—the Convention Act—was an Act of Congress.  She argued that "[b]ecause a non-self-executing treaty [such as the Convention] cannot itself provide a rule of decision in U.S. courts, the only candidate for a source of federal law with preemptive force under the Supremacy Clause is the statute that implements the treaty."  *Id*. at 737, 741–42. Thus, it was an Act of Congress—the Convention Act—that must be construed to supersede state

law.  *Id*. at 748.  The dissent concluded that because McCarran-Ferguson requires federal statutes that affect the business of insurance to do so explicitly, and the Convention's implementing statute does not do so, the Convention Act "is therefore powerless to preempt state law."  *Id*. at 737.

The Fourth Circuit addressed this same issue in *ESAB Group*.  The Fourth Circuit reached the same conclusion as the majority in *Safety National* but chose not to adopt the Fifth Circuit's reasoning.  The court explained that Judge Elrod's dissent "persuasively refute[d] the majority's position that the provisions of a non-self-executing, implemented treaty have full preemptive effect."  *ESAB Group*, 685 F.3d at 396 (quotation omitted).  Instead, the Fourth Circuit found that Congress did not intend for the McCarran-Ferguson Act to supersede statutes implementing treaties, i.e., the Convention Act.  The Fourth Circuit also assumed that the Convention Act is non-self-executing and held that, as implementing legislation of a treaty, it does not fall within the scope of McCarran-Ferguson and is not subject to reverse-preemption, because "Supreme Court precedent dictates that McCarran–Ferguson is limited to legislation within the domestic realm[.]"  *Id*. at 388–90.

More recently, the Ninth Circuit addressed this issue and concluded that Article II, Section 3 of the Convention is self-executing, and therefore not an "Act of Congress" subject to reverse-preemption by McCarran-Ferguson.  *See CLMS Mgmt. Servs. LP v. Amwins Brokerage of Ga.*, 8 F.4th 1007, 1016 (9th Cir. 2021).  The Ninth Circuit explained that while the Fourth Circuit and Fifth Circuit majority stopped short of deciding whether Article II, Section 3 of the Convention is self-executing, they both recognized that Article II, Section 3 is a "mandatory directive to domestic courts, and this is an essential characteristic of self-executing treaties."  *Id*.  Next, the court concluded that treaties are not an "Act of Congress" because they require only the approval of the Senate.  *Id*. at 1016–17 (citing U.S. Const. art. II, § 2, cl. 2).  Rather, treaties are more accurately

described as "an exercise of executive power constrained by the Constitution." And because Article II, Section 3 of the Convention is self-executing, the court held that it provides a rule of decision not superseded by the McCarran-Ferguson Act because the Convention is not an "Act of Congress." *Id*. at 1012, 1017.

In sum, the Circuit Courts of Appeals that have addressed the issue have made conflicting rulings on the interplay between the Convention, the Convention Act, and the McCarran-Ferguson Act.

### b.   Tenth Circuit Guidance

The Tenth Circuit has not yet addressed the specific issue of whether McCarran-Ferguson authorizes state law to reverse-preempt the Convention or the Convention Act. However, the Tenth Circuit has recently stated that the Convention is *not* self-executing in a case addressing the confirmation of an international arbitration award. *See Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, -- F.4th --, 2023 WL 140552 (10th Cir. 2023). In that case, Grupo Cementos de Chihuahua S.A.B. de C.V. ("GCC"), a set of related Mexican companies, entered into a shareholder agreement with Compañía de Inversiones Mercantiles S.A. ("CIMSA"). *Id*. at *1. The agreement provided that the parties must submit disputes to international arbitration, apply Bolivian law, and expressly waive all actions for annulment, objection, or appeal against the award. *Id*. A dispute arose, and CIMSA initiated arbitration proceedings. *Id*. at *2. The arbitration tribunal held that GCC breached the right of first refusal and awarded CIMSA approximately $34 million in damages. *Id*. GCC fought the award in the Bolivian courts, losing before a chamber of Bolivia's highest constitutional court in 2016. *Id*. at *3-4.

In September 2015, CIMSA petitioned the U.S. District Court for the District of Colorado to confirm the arbitration award, relying on Article IV of the Convention.  *Id*. at *5; *see also* The Convention art. IV, June 10, 1958, 21 U.S.T. 2517 (providing that a party to international arbitration may apply for "recognition and enforcement" of an arbitral award).  In 2019, CIMSA obtained an order from the district court confirming the award after the court concluded the award was binding under the Convention.  *Id*. at *5–6.  In 2020, GCC convinced a different chamber of Bolivia's highest constitutional court to invalidate its prior decision, and a Bolivian trial judge subsequently annulled the award.  *Id*. at *6.  GCC then moved the district court to vacate the confirmation order under Rule 60(b)(5).  The district court denied the motion, reasoning that "GCC's conduct in Bolivian and U.S. courts swayed [Rule 60(b)'s] equitable considerations decidedly against it."  *Id*. at *7.  GCC appealed.

The Tenth Circuit affirmed the district court's refusal to vacate the judgment, finding that the district court did not abuse its discretion as Rule 60(b) relief is extraordinary relief that should only be granted in exceptional circumstances.  *Id*. at *19.  In a dissenting opinion, Judge Rossman criticized the majority's Rule 60(b) analysis, contending that "this is ultimately a New York Convention case."  *Id.* at *40 (Rossman, J., dissenting).  Judge Rossman noted that "where Rule 60(b)(5) is invoked as a procedural tool under the New York Convention, the hurdle for claimants is not as high, nor the district court's discretion quite as limitless, as the majority posits."  *Id*.

The majority addressed Judge Rossman's criticism in a footnote, explaining that "as the dissent appears to acknowledge, *the Convention is not self-executing*," because "*[n]one* of its provisions 'operates of itself without the aid of any legislative provision.'"  *Id.* at *19 n.25 (emphasis added) (quoting *Medellin v. Texas*, 552 U.S. 491, 505 (2008)).  Instead, the majority explained, the Convention instructs secondary jurisdictions to apply their domestic procedural

22

rules in enforcing the Convention.  *Id.*; *see also* The Convention art. IV, June 10, 1958, 21 U.S.T. 2517 ("Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles.").  The majority explained that "[i]n the United States, this means the Federal Rules of Civil Procedure.  GCC invoked Rule 60(b)(5), which frames our analysis of the substantive law at issue."  *Id.*

> **c.    The Convention is non-self-executing and has no preemptive effect, and the Convention Act is reverse-preempted by Oklahoma insurance law, by operation of the McCarran-Ferguson Act.**

Here, the first issue to resolve is whether Article II of the Convention is self-executing. *See* The Convention art. II, June 10, 1958, 21 U.S.T. 2517 ("The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.").  In light of the Tenth Circuit opinion in *Compañía de Inversiones Mercantiles*, the court finds that Article II is not self-executing.  Although that case only implicated Article IV (enforcement of arbitral awards), and not Article II (enforcement of written arbitration agreements), the language used by the majority does not imply that the Convention is only partially self-executing.  Instead, the majority broadly declared that "*the Convention* is not self-executing," because "*[n]one of its provisions* operates of itself without the aid of any legislative provision." *Compañía de Inversiones Mercantiles S.A.*, 2023 WL 140552, at *19 n.25 (quotation omitted) (emphasis added); *see also Medellín*, 552 U.S. at 505 (stating that when treaty stipulations "are not self-executing they can only be enforced pursuant to legislation to carry them into effect.").

And the conclusion that the Convention, in its entirety, is not self-executing is supported by authority from the Second Circuit, as well as Supreme Court dicta. *See Stephens v. Am. Int'l Ins. Co.*, 66 F.3d 41, 45 (2d Cir. 1995) (holding that "the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation"); *see also Medellin*, 552 U.S. at 521-22 (citing Chapter 2 of the FAA as an example of when Congress implemented a non-self-executing treaty); *Safety Nat'l Cas. Corp.*, 587 F.3d at 722 ("This reference in *Medellin* could be read to imply that the Convention in its entirety is not self-executing, although such a conclusion cannot be drawn with any certainty from the brief discussion in the Court's opinion."); *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n.15 (1974) (observing, although without deciding whether the Convention was self-executing, that "Congress passed Chapter 2 of the United States Arbitration Act in order to implement the Convention" (citation omitted)).

Having concluded that the Convention is not self-executing, the next issue is whether it can be construed to supersede state insurance law. The Fifth Circuit majority in *Safety National* concluded that, even assuming the Convention was non-self-executing, it still has full preemptive effect. The majority reasoned that even though the Convention treaty has implementing legislation, it was the Convention itself, and not the Convention Act, that was being "construed" under McCarran-Ferguson's language to supersede state law, because the Convention Act implements the Convention largely by reference rather than setting out the Convention's provisions within the text of the Convention Act. But the court does not find this rationale to be persuasive. As Judge Elrod explained in her dissent, "the Supreme Court has repeatedly affirmed that only self-executing treaties operate by their own force to provide a rule of decision in the courts." *Safety Nat'l*, 587 F.3d at 739 (Elrod, J., dissenting). "Non-self-executing treaties, in contrast can only be enforced pursuant to legislation to carry them into effect." *Id*. (quotation

omitted); *see also Medellin*, 552 U.S. at 527 ("A non-self-executing treaty, by definition, is one that was ratified with the understanding that it is not to have domestic effect of its own force.'). Because a non-self-executing treaty provision, by itself, has no legal force in domestic courts, it cannot have any preemptive force either.  *See, e.g.*, *Banks v. McCarthy*, 699 F. App'x 639, 640 (9th Cir. 2017) (holding that provisions of a non-self-executing treaty did not preempt Title VII). Accordingly, the only candidate for a source of federal law with preemptive force under the Supremacy Clause is the Convention's implementing statute, the Convention Act.

The issue is then whether the OUAA reverse-preempts the Convention's implementing legislation, the Convention Act, which does have domestic effect of its own force.  In its reply, Hannover relies upon the Fourth Circuit's decision in *ESAB Group*.  Despite McCarran-Ferguson's proclamation that *no* "Act of Congress shall be construed" to supersede any state insurance law, 15 U.S.C. § 1012(b), the Fourth Circuit held that the Convention Act did not fall within its scope, and was therefore not subject to reverse-preemption.  *See ESAB Group*, 685 F.3d at 388–90.  The court acknowledged the rule of statutory construction that in the absence of "clear congressional intent to the contrary, we will give the statute its plain meaning," but observed that "[w]here a statute touches upon foreign relations and the United States' treaty obligations, we must proceed with particular care in undertaking this interpretive task."  *Id*. at 388.  As such, the court declined to construe "Act of Congress," as that term is used in McCarran-Ferguson, "to apply to every federal statute, irrespective of the international implications."  *Id*.  The court reasoned that, in enacting McCarran-Ferguson, "Congress plainly did not intend the law to apply so broadly."  *Id*. Because McCarran-Ferguson was "limited to legislation within the domestic realm," the court concluded that the Convention Act was not subject to reverse-preemption.  *Id*. at 388–90.

The court does not find the Fourth Circuit's rationale persuasive either. The Supreme Court has explained that "the starting point in a case involving construction of the McCarran–Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself." *Fabe*, 508 U.S. at 500; *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there."). The court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd.*, 508 U.S. at 500. Thus, where statutory text is unambiguous, it is not proper to resort to policy considerations or legislative history. *See United States v. Herrera*, 51 F.4th 1226, 1288 (10th Cir. 2022) ("But when the statutory text is unambiguous, we need not rely on legislative history."); *Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.").

Consistent with these directives, the court begins with the statutory text. The applicable section of McCarran-Ferguson provides, in full:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012(b).

The court finds that this language is unambiguous.  *See Fabe*, 508 U.S. at 504, 507–508 (stating that § 1012(b) is "unambiguous" and rejecting the petitioner's attempt to rely on legislative history to support his interpretation of the McCarran-Ferguson Act where his "interpretation of the statute [was] at odds with its plain language").  It clearly provides that "no Act of Congress" shall be construed to supersede state law "regulating the business of insurance," unless such Act "specifically relates to the business of insurance."  *See id.* at 507 (stating that this language creates a clear-statement rule that "state laws enacted for the purpose of regulating the business of insurance do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise").

Applying the plain language of the statute, the court concludes that the Convention Act must yield to the OUAA.  First, the Convention Act is clearly an "Act of Congress" within the McCarran-Ferguson Act's meaning.  *See Safety Nat'l*, 587 F.3d at 748–49 (Elrod, J., dissenting) (quoting the opening words of the Convention Act, Pub. L. No. 91-368, 84 Stat. 692 (1970), and explaining that "the legislation is plainly labeled as an Act of Congress" without any ambiguity).  Next, the Convention Act does not "specifically relate[] to the business of insurance."  *See id.* at 720 (majority acknowledging that "[f]or the purposes of the McCarran–Ferguson Act, neither the Convention nor the Convention Act specifically relates to the business of insurance").  And, as discussed in Section III.B.1.b *supra*, § 1855(D) of the OUAA was enacted for the purpose of regulating the "business of insurance."  *See Sparks*, 467 P.3d at 691 ("We further hold that § 1855 of this Act is a state law enacted for the purpose of regulating insurance, and thus, the McCarran-Ferguson Act applies precluding the Federal Arbitration Act from preempting conflicting state law."); *Mut. Reinsurance Bureau v*, 969 F.2d 931, 933 (10th Cir. 1992) (holding that substantially similar provision in the KUAA "directly regulates the relationship between the insurance company

and its policyholder by stating that an agreement between the two to arbitrate a dispute is unenforceable"). Finally, application of the Convention Act to enforce the Policy's arbitration clause would "invalidate, impair, or supersede" the OUAA, because it expressly proscribes the enforcement of the Policy's arbitration clause.

Accordingly, McCarran-Ferguson dictates that the Convention Act must yield to § 1855(D) of the OUAA in this case. "This interpretation is the only one that does not contradict the plain language of the McCarran–Ferguson Act, and does not rely on policy considerations that need not and should not be addressed in light of the unambiguous language of the McCarran–Ferguson Act." *Foresight Energy, LLC v. Certain London Mkt. Ins. Cos.*, 311 F. Supp. 3d 1085, 1099 (E.D. Mo. 2018) (holding that the Convention Act is reverse-preempted by Missouri insurance law, by operation of the McCarran-Ferguson Act); *see also Stephens*, 66 F.3d at 45–46 (holding that the Convention is not self-executing, and that the Convention Act was reverse-preempted by an anti-arbitration provision of Kentucky law enacted to regulate the business of insurance).

Because both Chapters 1 and 2 of the FAA are both reverse-preempted by the OUAA, the FAA does not provide a basis for the court to order arbitration. Under the OUAA, the Policy's arbitration clause is unenforceable. Accordingly, Hannover's motion to stay pending arbitration is denied. *See* 9 U.S.C. § 3 (providing that the FAA requires a stay of a pending suit only if the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement").

## IV.   CONCLUSION

IT IS THEREFORE ORDERED that Lloyd's motion to dismiss (Doc. 35) is GRANTED. Plaintiffs' claims against the Underwriters are DISMISSED for failure to state a claim.

IT IS FURTHER ORDERED that Hannover's motion to stay (Doc. 48) is DENIED.

IT IS FURTHER ORDERED that Hannover's motion for a hearing (Doc. 57) is DENIED.

IT IS SO ORDERED.  Dated this 9th day of February, 2023.

_s/John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE